**[Cite as *In re C.A.*, 2026-Ohio-2284.]**

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

IN RE: C.A.

C.A. No.     31803

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 24-04-228

DECISION AND JOURNAL ENTRY

Dated: June 17, 2026

FLAGG LANZINGER, Presiding Judge.

{¶1}     Appellant Mother appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights and placed her child in the permanent custody of Summit County Children Services Board ("CSB" or "the agency"). This Court affirms.

I.

{¶2}     Mother is the biological mother of C.A., born July 13, 2020. She has three other children who are not subjects of this appeal, although some facts regarding them are relevant. The child's father has not appealed.

{¶3}     In May 2022, CSB removed C.A. from his parents' physical custody based on concerns about substance abuse and domestic violence in their home. By stipulation of the parties, the juvenile court adjudicated the child abused and dependent. In November 2022, the trial court returned C.A. to Mother's legal custody under CSB's protective supervision. Two months later, the juvenile court terminated the agency's protective supervision and closed the case.

{¶4} Fifteen months later, in April 2024, CSB removed C.A. and his 16-year-old brother A.M. from Mother's home after A.M. reported that Mother was physically abusing him and using drugs. Father was in a residential drug treatment facility at the time. During the next week, Mother twice tested positive for methamphetamine and THC. The agency filed a complaint alleging that C.A. was a dependent child. CSB also filed a complaint regarding A.M., but the particulars of that case are not in this record.

{¶5} Mother and Father waived their rights to both the adjudicatory and initial dispositional hearings. They stipulated to C.A.'s dependency, his placement in CSB's temporary custody, and the adoption of the agency's case plan as an order. The case plan required Mother to obtain a substance use assessment, follow all recommendations, and submit to random drug screens.[1] Mother was allowed to visit with C.A. as she might arrange with CSB and the child's foster parents.

{¶6} Three weeks later, Mother was sentenced to two and a half months in jail after an incident in May 2024 that resulted in charges against her for felonious assault and domestic violence against Father. After her release from incarceration, Mother was placed on probation. She began visiting with C.A. weekly in her home under supervision. Shortly thereafter, Mother moved for increased, overnight, and unsupervised visits; and legal custody, with or without protective supervision by CSB. After a review hearing, the magistrate granted Mother unsupervised visits but maintained C.A. in the agency's temporary custody.

{¶7} In advance of the one-year sunset date, CSB moved for legal custody to Mother under the agency's protective supervision. At the motion hearing, Mother and the guardian ad

---

[1] Mother's only other case plan objective required her to participate in family counseling with A.M. when that child's counselor deemed it appropriate.

litem joined in CSB's motion and agreed to the child's return to Mother's legal custody under the agency's protective supervision. The magistrate granted the motion on April 25, 2025, finding that Mother was engaged in treatment, unsupervised visits were going well, and there was a strong Mother-child bond.

{¶8} Less than a month later, on May 22, 2025, the Barberton Police Department removed C.A. from Mother's home pursuant to Juv.R. 6 and arrested Mother for stabbing her then-boyfriend. CSB moved to modify the child's disposition from protective supervision to emergency temporary custody to temporary custody. Mother waived her right to a shelter care hearing, and the juvenile court granted temporary custody of the child to CSB. Subsequently, the charges against Mother were dismissed after she and her then-boyfriend reported that Mother had acted in self-defense.

{¶9} Mother again moved for legal custody, with or without protective supervision. Immediately prior to the hearing on Mother's motion, the guardian ad litem moved for permanent custody, necessitating the rescheduling of the dispositional hearing. The juvenile court scheduled the final sunset dispositional hearing for January 7, 2026, which gave Mother over six additional months to work on her case plan objectives. Before the final hearing, CSB timely moved for a second six-month extension of temporary custody.

{¶10} Immediately before the presentation of evidence on the parties' competing motions, Mother's counsel informed the juvenile court that Mother alternatively joined in the agency's motion for an extension of temporary custody. After the conclusion of the hearing, the juvenile court issued a judgment denying Mother's and CSB's motions, granting the guardian's motion for permanent custody, and terminating all parental rights to the child. Mother timely appealed and

now raises two assignments of error for review. This Court consolidates the assignments of error to facilitate our review of the intertwined issues.

II.

### ASSIGNMENT OF ERROR I

THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING THE MOTION FOR A SIX-MONTH EXTENSION AND INSTEAD PLACING THE SUBJECT CHILD IN THE PERMANENT CUSTODY OF [CSB].

### ASSIGNMENT OF ERROR II

THE TRIAL COURT DECISION DENYING A SIX-MONTH EXTENSION AND INSTEAD PLACING THE CHILD IN THE PERMANENT CUSTODY OF [CSB] WAS AGAINST THE MANIFEST WEIGHT OF EVIDENCE.

{¶11} Mother argues that the juvenile court erred by denying a six-month extension of temporary custody, instead granting permanent custody and terminating Mother's parental rights. This Court disagrees.

{¶12} Mother makes three arguments on appeal: (1) the juvenile court's finding that an award of permanent custody was in the child's best interest is against the manifest weight of the evidence; (2) the juvenile court erred by applying the more burdensome test for a second six-month extension under R.C. 2151.415(D)(2) in lieu of the test for a first six-month extension under subsection (D)(1); and (3) if the test for a second six-month extension of temporary custody was applicable in this case, the juvenile court abused its discretion by denying the extension.

Manifest weight of the evidence

{¶13} In determining whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment]

must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶14} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996).

{¶15} The best interest factors include: the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 2009-Ohio-6284, ¶ 11 (9th Dist.). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶16} As to the first prong, the guardian ad litem alleged, and the juvenile court found, that C.A. had been in the agency's temporary custody for 12 or more months of a consecutive 22-month period pursuant to R.C. 2151.414(B)(1)(d). Mother does not contest this finding. Our

review of the record indicates that clear and convincing evidence supports the trial court's first prong finding.

{¶17} Mother argues that permanent custody is contrary to the best interest of C.A. She focuses her argument on the best interest factor in R.C. 2151.414(D)(d), "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" Specifically, Mother argues that the weight of the evidence supports a finding that she had sufficiently complied with her case plan objectives to demonstrate that she would be able to provide a legally secure permanent placement for C.A. Although case plan compliance is relevant to the best interest of the child, this Court has repeatedly recognized that it is not dispositive of that issue. *In re M.S.*, 2023-Ohio-1558, ¶ 24 (9th Dist.). In this case, while Mother was participating in services, she had not made adequate progress to demonstrate that she had remedied the long-term concerns underlying C.A.'s removal.

{¶18} Mother's sole case plan objective required her to obtain a substance abuse assessment, follow all recommendations arising therefrom, and submit to random drug screens. She timely obtained an assessment at Community Health Center ("CHC"). Her diagnoses included cannabis use disorder, alcohol use disorder, post-traumatic stress disorder, and bipolar I disorder. The assessor identified three problem areas and made recommendations regarding each. Those problem areas included: (1) legal problems based on Mother's domestic violence charge wherein her 16-year-old son A.M. was the victim, and Mother's involvement in court cases involving CSB and two of her children; (2) anxiety; and (3) substance abuse. The treatment recommendations to address those problems included, respectively: (1) maintaining a recovery program, free from addiction and legal conflicts; (2) stabilizing anxiety levels while increasing the ability to function

on a daily basis; and (3) establishing sustained recovery, free from the use of all mood-altering substances. Counseling was a key component designed to help Mother reach those goals.

{¶19} Mother was engaged in weekly counseling through the Women's Recovery Program ("WRP") at CHC. Her treatment plan included maintaining sobriety, complying with CSB's requirements, and complying with her probation requirements. Mother's probation officer testified that Mother's terms of probation included reporting as directed, abstaining from substance use, completing drug screens, participating in treatment services, and obeying all laws. Moreover, Mother was scheduled to meet monthly with a psychologist for counseling at Portage Path Behavioral Health ("PPBH"). There, she engaged in four types of therapies designed to help her improve her insight regarding triggering events and other stimuli, recognize unhelpful thoughts and behaviors, and develop strategies to regulate her emotions and cope with stressors. In addition, Mother had monthly appointments to see a psychiatrist at Life Stance for medication management. Her psychiatrist prescribed two medications to help Mother manage both depression and anxiety.

{¶20} While Mother argues that she was compliant with her case plan objectives, she narrowly construes those objectives as "limited[,]" consisting merely of "engag[ing] in a substance abuse assessment and follow[ing] any treatment recommendations and submit[ting] to random drug screening at the request of [CSB] or her treatment provider." Mother disregards the detailed recommendations of her assessment, arguing that they were not "actual requirements of [her] case plan objectives[.]" The case plan's requirement for her to follow all recommendations arising from her assessment, however, gave rise to a need for much greater participation in services to help Mother overcome the issues preventing her from providing a safe and stable home for C.A. Accordingly, in pursuit of reunification, she was bound to comply with the myriad of recommendations arising from her counseling sessions, psychiatric medication management, and

terms of probation. As a result, Mother was required not only to participate in counseling and drug screening, but also to make progress toward alleviating the issues underlying those recommendations.

{¶21} The caseworker testified that all parties agreed to return the child to Mother's legal custody under agency protective supervision in April 2025 based on Mother's progress addressing her case plan objectives up to that time. After CSB removed C.A. a month later, however, based on an incident of domestic violence in the home, Mother's progress waned. She immediately tested positive for amphetamines. Despite continuing to participate in substance abuse counseling, Mother again tested positive for amphetamines and methamphetamine in both September and October 2025.

{¶22} Mother's WRP counselor scheduled weekly sessions after Mother's positive drug screen in May 2025, in lieu of prior biweekly sessions. Although the counselor and Mother routinely discussed tools to identify triggers for substance use and coping mechanisms to avoid use, Mother relapsed twice more. The counselor testified that, while relapse sometimes occurs, it is most important that the client recognizes the substance use and continues treatment, focusing on avoiding triggers and spending time with a sober support network. In this case, Mother denied that she had used drugs, notwithstanding her positive screens. Moreover, she was not involved in any 12-step or other group accountability program.

{¶23} Mother's WRP counselor was concerned that Mother fails to be accountable for her drug use. Her probation officer also testified that Mother lacks accountability and frequently blames others for her problems instead of accepting responsibility for the choices she has made.

{¶24} Mother's counselors at WRP and PPBH, her psychiatrist, and her probation officer all testified that Mother has missed multiple appointments. For example, her PPBH counselor

testified that Mother failed to show up for eight of her 23 scheduled monthly appointments. Her psychiatrist testified that Mother attended only four of her six scheduled monthly appointments, failing to notify the office that she would not attend the appointments she missed. Her probation officer was concerned that Mother often rescheduled treatment services due to "feeling ill." Mother failed to attend or call off all three scheduled and rescheduled appointments with Probation in October 2025. She attended her November 2025 appointment but called in sick for the December 2025 appointment. Her probation officer told Mother to bring a note from a doctor to verify she was ill, but Mother failed to do so when she met with the officer the following month.

{¶25} While the caseworker testified that she was confident in Mother's ability to parent C.A. in April 2025, based on her case plan progress up to that time, she acknowledged that Mother is "[n]ot yet today" ready to reunify with the child. The caseworker wanted to see Mother demonstrate a sustained period of sobriety and continue to participate in services. Both of Mother's counselors saw the need for her to continue attending sessions and each recommended that Mother would benefit from additional services like anger management, group counseling, and developing a sober support system.

{¶26} Mother's counselors testified that they worked with her on the same issues during the first year of the case until the child was returned home, and after CSB again removed C.A. Mother's services focused on helping her develop insight into circumstances that trigger her emotional dysregulation and desire to use drugs, and assimilate coping skills to calm herself and avoid relapse. While both counselors testified that they believe Mother has made progress using adaptive strategies more consistently, neither was aware that Mother often presents as overwhelmed during her appointments with her probation officer. In fact, the probation officer testified that Mother's behaviors were especially concerning at their meeting the day before the

hearing. Mother kept fidgeting, raising her voice, and crying, making it very difficult for her to stay on task during the appointment.

{¶27} Even Mother's counselors admitted that Mother "can be pretty activated" during sessions, getting upset and loud. During those times, the counselors directed Mother to identify and use a coping skill she has learned to self-regulate. Although Mother told her counselors that she had a box of cards at home with coping strategies on them to reference when she was struggling, they could only speculate that she was effectively using those techniques when required.

{¶28} On the contrary, the evidence demonstrated that Mother had not successfully incorporated those strategies to cope with stressors in her life in a healthy way. For example, shortly after CSB again removed C.A. in May 2025, Mother tested positive for amphetamines. Significantly, Mother was pregnant at that time. After giving birth to a daughter in August 2025, there was an incident a few weeks later when Mother passed out from exhaustion in her car after the baby's well-child visit, leaving the infant in a car seat on the ground beside her car. CSB briefly removed the infant from Mother's care until a drug test showed no drugs in her system at the time. Shortly thereafter, however, Mother tested positive for amphetamines and methamphetamine. Six weeks later, she again tested positive for those drugs.

{¶29} Although Mother's psychiatrist had prescribed Xanax to help her manage her anxiety, the evidence showed that Mother did not use that tool appropriately. Her psychiatrist testified that Mother was to take three Xanax pills daily, spread out throughout the day. She was permitted to take a fourth pill daily, if she found it necessary. Her probation officer testified that she was very concerned when Mother reported that she planned to take five Xanax pills together before the permanent custody hearing to deal with the stress of those proceedings. Mother's WRP

counselor testified that she believed Mother was in crisis and not using appropriate skills to manage stressors if that was her plan.

{¶30} Mother's counselor also testified that Xanax is a benzodiazepine which would show up as such on her drug screens. Of the twelve drug screen results in the record during the time she was treating with her psychiatrist, Mother tested positive for benzodiazepine only three times, indicating she was not taking her Xanax as prescribed.

{¶31} Mother did not testify at the hearing. Accordingly, she did not identify coping skills she had incorporated into her daily life to help her manage stressors and anxiety. She presented no examples of stressful situations she navigated in a healthy way. She did not explain why she tested positive for amphetamines and methamphetamine use when she reported to service providers that she had not used those substances.

{¶32} Although Mother's counselors and the caseworker testified that Mother had made some progress, all three recognized Mother's need for ongoing services. She had not yet assimilated the necessary coping skills to allow her to manage stressors and anxiety in a healthy way, avoiding lapsing into crisis situations and substance use. The guardian ad litem testified that Mother's efforts and engagement in services "have not translated to tangible, sustained levels of sobriety, … staying away from legal troubles, [or] to overall sustained emotional regulation." While acknowledging that Mother is receptive to counseling and wants to develop the skills to improve her reactions to the stressors in her life, the guardian ad litem testified that Mother has not learned to apply the strategies and tools presented by her service providers. As a result, Mother has not alleviated major ongoing issues that impact her ability to provide a safe and stable home for C.A.

{¶33} The guardian ad litem noted that Mother had been unable to sustain the progress she made that allowed the child's return to her care, resulting in his removal less than one month later. As Mother had even more positive drugs screens in the eight months since C.A.'s second removal in this case than in the first year, the guardian ad litem opined that Mother was unlikely to remedy any ongoing concerns during an extension of temporary custody.

{¶34} Based on this Court's review of the record, we conclude that clear and convincing evidence demonstrated that Mother had not sufficiently complied with her case plan objectives to demonstrate that she would be able to provide a legally secure permanent placement for C.A. Accordingly, the juvenile court's finding that, given Mother's lack of case plan compliance, a legally secure placement for the child could not be achieved without a grant of permanent custody to CSB is not against the manifest weight of the evidence.

{¶35} As to the remaining best interest factors, the juvenile court's finding that they mitigate in favor of permanent custody was supported by clear and convincing evidence. During the five-year-old child's life, he experienced the trauma of three removals by CSB from Mother's home. He spent more than two years in the agency's temporary custody, placed in the same foster home all three times. Mother had the opportunity for regular visits with the child but was not always consistent. She missed almost three months of visits while she was incarcerated and another three months after the child's second removal because she did not want to visit at the Family Interaction Center. During the four months prior to the hearing, Mother missed six additional weekly visits.

{¶36} While C.A. has a strong bond with Mother and is affectionate with his baby sister, he is also strongly bonded with his foster parents and their eight-year-old daughter. He is very comfortable with his foster parents to whom he refers as "Mom and Dad." The foster parents are

willing to adopt the child and provide a permanent home for him. After the guardian ad litem asked the child to draw a picture indicating where he would like to live, C.A. drew a house and three people: his foster parents and his best friend. The guardian ad litem opined that placing the child in CSB's permanent custody would be in his best interest, reasoning that C.A. deserves stability with consistent caregivers after being "bounced back and forth already too many times." Under these circumstances, our review of the record indicates that this is not the exceptional case in which the trier of fact clearly lost its way and committed a manifest miscarriage of justice by terminating parental rights and awarding permanent custody of C.A. to CSB. Accordingly, the juvenile court's judgment is not against the manifest weight of the evidence.

Six-month extension of temporary custody

{¶37} Mother next challenges the juvenile court's denial of a six-month extension of temporary custody to allow her additional time to work toward reunification. She first argues that the trial court erred by applying the test for a second six-month extension, rather than the less burdensome test for a first six-month extension.

{¶38} The juvenile court stated that "Mother received a de facto first six-month extension when this child was returned to [CSB] custody in May 2025, one month after the one-year Sunset date upon the failed reunification." This Court need not and, therefore, does not here decide whether a de facto first six-month extension of temporary may occur under the law.

{¶39} In this case, CSB moved expressly for a second six-month extension, arguing that the factors enumerated in R.C. 2151.415(D)(2) had been met. During preliminary discussions immediately prior to the presentation of evidence at the permanent custody hearing, the juvenile court identified the pending motions, including the agency's motion for a second six-month extension of temporary custody. Not only did Mother fail to object to the trial court's consideration

of factors relevant to a second six-month extension, but she also informed the juvenile court that she joined CSB's motion as an alternative to her pending motion for legal custody. Because she asked for a second six-month extension, she cannot now complain that the juvenile court considered the factors relevant to that request. *See State v. Hessler*, 90 Ohio St.3d 108, 121 and 126 (holding in a death penalty case that an appellant's agreement waives or forfeits all but plain error, and that an appellant may not take advantage of an error, if one exists, that she invited or induced).

{¶40} Here, Mother does not argue plain error, but rather that the juvenile court abused its discretion. Moreover, even assuming arguendo that the trial court applied the incorrect R.C. 2151.415(D) factors, Mother asked the court to do so by joining in CSB's express motion for a second six-month extension. Accordingly, Mother's challenge to the juvenile court's consideration of the subsection (D)(2) factors fails.

{¶41} Mother next argues that, assuming application of the second six-month extension factors was appropriate, the juvenile court abused its discretion by denying the motion for an extension of temporary custody. This Court disagrees.

{¶42} The juvenile court "may" extend temporary custody for up to six months under certain circumstances. R.C. 2151.415(D). We review the trial court's decision to grant or deny a request for an extension for an abuse of discretion. *In re P.H.*, 2021-Ohio-3726, ¶ 25 (9th Dist.), citing *In re A.S.*, 2017-Ohio-8984, ¶ 11 (9th Dist.). The juvenile court abuses its discretion when it acts in an unreasonable, arbitrary, or unconscionable manner. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶43} The trial court has authority to exercise its discretion to grant a second six-month extension of temporary custody, however, only if the moving party has proved by clear and

convincing evidence all of the following: "the additional extension is in the best interest of the child, there has been substantial additional progress since the original extension of temporary custody in the case plan of the child, there has been substantial additional progress since the original extension of temporary custody toward reunifying the child with one of the parents or otherwise permanently placing the child, and there is reasonable cause to believe that the child will be reunified with one of the parents or otherwise placed in a permanent setting before the expiration of the additional extension period." R.C. 2151.415(D)(2); *In re A.B.*, 2026-Ohio-612, ¶ 27-28 (9th Dist.).

{¶44} As the parties moving for a six-month extension of temporary custody, CSB and Mother bore the burden of proof. *See In re R.S.*, 2023-Ohio-2224, ¶ 46 (9th Dist.) (holding parents responsible for supporting their motions in child custody cases with the requisite burden of proof). CSB has not appealed the denial of the agency's motion. Mother did not testify in support of her request for an extension of temporary custody. Nevertheless, this Court will consider the evidence elicited by both CSB and Mother in support of their joint motion for a six-month extension.

{¶45} This Court has already discussed the evidence relating to the best interest of the child and concluded that the juvenile court's finding that an award of permanent custody was in the best interest of C.A. is not against the manifest weight of the evidence. Neither Mother nor CSB presented clear and convincing evidence to overcome that finding. As discussed above, C.A. has spent a significant part of his short life out of Mother's custody and in the care of foster parents with whom he is bonded, comfortable, and well-acclimated. The child indicated his desire to continue living with them, and the guardian ad litem recommended permanent custody in C.A.'s best interest. After three separate removals from Mother's home, the child needs a legally secure permanent placement, which Mother remains unable to provide. Under these circumstances, there

was no clear and convincing evidence to show that extending temporary custody was in the child's best interest.

{¶46} Moreover, we have thoroughly discussed the evidence relating to Mother's case plan compliance above. Not only did Mother fail to make substantial additional progress on her objectives, but she failed to maintain the progress she had made earlier in the case. Three drug screens showed that she continued to use amphetamines and methamphetamines, notwithstanding her ongoing participation in drug treatment services. She failed to demonstrate that she had assimilated the coping skills discussed during counseling sessions, leading to her admissions to service providers that she felt overwhelmed, ongoing emotional dysregulation, and frequent relapse into drug use. The caseworker conceded that, notwithstanding Mother's earlier progress supporting the return of the child to her custody, Mother was not capable of providing an appropriate home for C.A. at the time of the hearing. Accordingly, Mother failed to prove by clear and convincing evidence that she had made substantial additional progress on the case plan.

{¶47} Finally, Mother failed to meet her burden of demonstrating reasonable cause to believe that C.A. would be reunified with her or otherwise permanently placed during a six-month extension. Mother does not argue why reunification would likely occur within a period of extension. She merely states that an extension of time would give her those additional months to work towards reunification. Mother further asserts that there is a reasonable likelihood of reunification in the next several months, without explaining why and further tempering that assertion with the caveat "[p]rovided that Mother maintained her sobriety[.]" Although she contends that she has demonstrated sobriety "for a significant period of time before," the evidence belies that contention. From May through October 2025, Mother intermittently tested positive for drug use three times. She did not attend several counseling sessions and visits during which she

might have been subjected to random drug screens. Given Mother's reversion to drug use as a coping mechanism and backsliding on her case plan objectives, Mother failed to prove reasonable cause to believe that reunification would occur during an extension of temporary custody.

{¶48} Mother failed to meet her burden of proving by clear and convincing evidence that a second six-month extension of temporary custody was warranted under R.C. 2151.415(D)(2). Accordingly, the juvenile court had no authority to exercise its discretion to grant the agency's and Mother's joint motion.

Conclusion

{¶49} The juvenile court's judgment awarding permanent custody of C.A. to CSB is not against the manifest weight of the evidence. Furthermore, Mother failed to prove by clear and convincing evidence that a six-month extension of temporary custody was warranted under R.C. 2151.415(D). Mother's first and second assignments of error are overruled.

III.

{¶50} Mother's two assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.


_____
JILL FLAGG LANZINGER
FOR THE COURT


SUTTON, J.
STEVENSON, J.
CONCUR.


APPEARANCES:

CORINNE HOOVER and LINDSAY L. MORETTA, Attorneys at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and ASHLEY JAMES, Assistant Prosecuting Attorney, for Appellee.

JOSEPH M. KERNAN, for Guardian ad Litem, Appellee.